## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAXIMILIAN ZIEMER and ANI AVETISYAN<br>158 Curtis St.<br>Somerville, MA 02144<br><br>Plaintiffs,<br><br>v.<br><br>NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING,<br>4000 Chemical Rd., Suite 200<br>Plymouth Meeting, PA 19462,<br><br>and<br><br>SERVBANK, SB<br>3201 Orchard Rd.<br>Oswego, IL 60543,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>: Civil Action No.: 1:25-cv-174<br>:<br>:<br>:<br>: **JURY TRIAL DEMANDED**<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## <u>COMPLAINT</u>

1.      Defendant NewRez LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") directly, or as its predecessor-in-interest, Specialized Loan Servicing, LLC ("SLS"), failed to remit property taxes on behalf of Plaintiffs Maximilian Ziemer and Ani Avetisyan ("Plaintiffs") for more than two years, resulting in a tax sale of their property.

2.      Plaintiffs' new mortgage servicer, Servbank, sb ("Servbank") failed to communicate fully and accurately with Plaintiffs about resolving the issue, resulting in duplicate payment that has not been refunded to Plaintiffs.

3.      Shellpoint and Servbank's (collectively, "Defendants") actions violate the Real Estate Settlement Procedures Act ("RESPA"), the D.C. Consumer Protection Procedures Act ("CPPA"), and District of Columbia common law.

**JURISDICTION**

4.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 1331.

5.      This Court has supplemental jurisdiction to hear all state law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this District because the acts and transactions occurred here, the real property that is the subject of this matter is located here and Defendant transacts business here.

**PARTIES**

7.      Plaintiffs are natural persons, married to each other, who currently reside in the United Kingdom.

8.      Shellpoint is a Delaware limited liability corporation and a mortgage servicer that does business in the District of Columbia.

9.      Shellpoint is licensed as a mortgage lender in the District of Columbia.

10.      Shellpoint's principal place of business is in Plymouth Meeting, Pennsylvania.

11.      In or around early 2024, Shellpoint acquired Specialized Loan Servicing, LLC ("SLS").

12.      As part of the acquisition, Shellpoint maintained SLS account numbers and online login information, and indicated on its website, "As of May 1, 2024, your mortgage loan, previously serviced by Specialized Loan Servicing (SLS), has transitioned to our new systems." *See https://www.shellpointmtg.com/sls/*.

13.      Shellpoint is the successor-in-interest to SLS and is responsible for all acts and omissions by SLS in the servicing of mortgages prior to the acquisition.

14.    Servbank is an Illinois entity and a mortgage servicer that does business in the District of Columbia.

15.    Servank's principal place of business is in Oswego, Illinois.

16.    Servank engages in the business of servicing mortgages for others and is a "mortgage lender" as defined in D.C. Code 26-1101(11)(A)(iii), though it does not currently hold a mortgage lender license in the District of Columbia.

17.    Defendants were, at all times applicable to each, responsible for receiving scheduled periodic payments Plaintiffs' mortgage loan and "making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan,", and is therefore a "servicer" as that term is defined in 12 U.S.C. § 2605(i)(2)-(3).

18.    Upon information and belief, each Defendant services more than 5,000 loans.

19.    At all times relevant hereto, Defendants acted directly or through agents, including, but not limited to, Core Logic Tax Services, LLC ("Core Logic"), and such agents were acting within the scope of their duties.

## FACTS

### Background

20.    Shellpoint and SLS have been the subject of significant complaints and litigation in connection with its servicing practices, many of which are at issue in this matter.

21.    Shellpoint settled a suit by the Massachusetts Attorney General alleging failure to help homeowners avoid foreclosure.  *See* https://www.mass.gov/news/ag-healey-secures-4-million-in-relief-for-homeowners-from-company-that-mishandled-mortgage-loans-and-foreclosures.

22.     In April 2022, Shellpoint settled a class action alleging the provision of misleading mortgage statements to borrowers in Covid-19 forbearances, for $500 million.  *See https://www.shellpointmortgagesettlement.com/home/1537/DocumentHandler?docPath=/Documents/Revised_Settlement_Agreement.pdf.*

23.     Shellpoint settled a class action in August 2021 alleging improper imposition of fees under Maryland law.  *See https://www.americanlegal.com/request-document/2cb25a5c55c5938c35cffe0f6611d2cb.*

24.     Another class action is pending relating to imposition of force-placed insurance, and another alleging improper payoff statements.  *See*  https://www.classaction.org/news/class-action-shellpoint-charges-for-property-insurance-even-if-homeowners-already-have-a-policy; https://classactionsreporter.com/shellpoint-mortgage-inadequate-explanation-of-payoff-items-class-action/.

25.     SLS entered into a consent order with the CFPB on or about May 11, 2020, arising from unlawful foreclosure practices.  *See https://www.consumerfinance.gov/enforcement/actions/specialized-loan-servicing-llc/.*

26.     SLS has also been the subject of multiple class actions, on issues including unauthorized contact with borrowers and charging unlawful fees.  *See https://cookcountyrecord.com/stories/651435545-class-action-accuses-specialized-loan-servicing-of-contacting-homeowners-in-foreclosure-instead-of-their-lawyers; https://www.classaction.org/news/specialized-loan-servicing-charged-illegal-pay-to-pay-fees-for-mortgage-payments-made-by-phone-class-action-claims;* https://www.kellyguzzo.com/class-action-against-sls-for-unlawful-mortgage-assessment/.

**Purchase of the Home and Refinance**

27.    On or about April 26, 2017, Plaintiffs purchased a property located at 2801 Cortland Place, NW, #304, Washington, DC 20008 (the "Property") to serve as Plaintiffs' primary residence.

28.    As a result of the Covid-19 pandemic, Plaintiffs relocated to the United Kingdom in or around 2020, with the intention that the move be temporary.

29.    On or about May 7, 2021, Plaintiffs refinanced the original mortgage on the Property into a new mortgage (the "Mortgage").

30.    Plaintiffs intended to maintain the Property as their primary residence at the time of refinance.

### Plaintiffs' Payment of Escrow Funds

31.    The Deed of Trust associated with the Mortgage required, absent express permission from the lender or servicer, that Plaintiffs would include payments for property taxes and insurance in their monthly payments and that the servicer would make those payments to the applicable entities on their behalf.

32.    Defendants maintained full control over the disbursements from the escrow account associated with the Mortgage.

33.    Plaintiffs timely made their full monthly payments each month for all months relevant hereto, including the full amount billed for escrow payments for taxes and insurance.

34.    Plaintiffs often paid more than the monthly mortgage payment due each month.

35.    Defendants received property tax bills directly, and Plaintiffs trusted that Defendants would fulfill their obligations to pay those taxes.

### Failure by SLS and Shellpoint to Pay Plaintiffs' Property Taxes

36.    In or around August 2021, SLS, predecessor-in-interest to Shellpoint, assumed servicing rights to the Mortgage.

37.    From the time it obtained servicing rights, SLS did not pay any taxes on Plaintiffs' property.

38.    Instead, SLS and Shellpoint's vendor, Core Logic, regularly remitted taxes for 2801 Cortland Street, NW, *#3*.

39.    Upon information and belief, Core Logic provided SLS and/or Shellpoint with invoices in connection with each of the tax payments.

40.    The invoices reflected payment on behalf of #3 rather than #304, but SLS and Shellpoint took no action to correct the error.

41.    SLS and Shellpoint conducted three annual escrow account reviews, with disclosures, dated May 9, 2022, May 9, 2023, and July 25, 2024.

42.    The first two escrow disclosures erroneously indicate that city taxes had been paid.

43.    The July 2024 disclosure did not provide any disbursement history but instead, under the second entitled "Account History," provided only projected disbursements.

44.    Through June 2022, Plaintiffs paid $278.98 each month in escrow to cover property taxes and insurance.

45.    Plaintiffs' monthly mortgage statement from SLS dated October 1, 2021, reflects a tax disbursement of $1,195.94 paid on September 2, 2021.

46.    Plaintiffs' monthly mortgage statement from SLS dated April 1, 2022, reflects a tax disbursement of $1,240.90 paid on March 22, 2022.

47.    Plaintiffs' monthly mortgage statement from SLS dated April 1, 2022, reflects a tax disbursement of $1,240.90 paid on March 22, 2022.

48.     Plaintiffs' monthly mortgage statement from SLS dated April 1, 2022, reflects a tax disbursement of $1,240.90 paid on March 22, 2022.

49.     The amount due for Plaintiffs' property taxes for the first half of 2022 should have been $1,532.70.

50.     As it was a duplicate payment for #3, the District of Columbia appears to have refunded the March 2022 payment to SLS on or about May 13, 2022.

51.     That refund, however, did not prompt any examination by SLS or raise any red flags of a potential error.

52.     From July 2022 through June 2023, Plaintiffs paid $240.58 each month in escrow to cover property taxes and insurance.

53.     Neither their property taxes nor their insurance premiums had decreased in the preceding year, and the escrow amount should not have gone down.

54.     That decrease, determined through an annual escrow review, also did not raise any red flags for SLS or prompt any additional investigation.

55.     Plaintiffs' monthly mortgage statement from SLS dated October 4, 2022, reflects a tax disbursement of $1,240.90 paid on September 28, 2022, which did not match the amount due for the Property.

56.     Plaintiffs' monthly mortgage statement from SLS dated October 4, 2023, reflects a tax disbursement of $1,153.16 paid on September 6, 2023, which did not match the amount due for the Property.

57.     On or about May 2, 2024, Shellpoint notified Plaintiffs of the transition, by virtue of merger, from SLS to Shellpoint.

58.     SLS issued Form 1098 mortgage interest statements to Plaintiffs for 2022 and 2023.

59.     The former indicated a property tax amount for the full year of $1,240.90, and the latter of $1,153.16.

60.     Though these amounts were less than half of the amounts due on the Property for those years, those discrepancies also did not prompt any additional review by Shellpoint.

## Tax Sale and Foreclosure

61.     On or about July 19, 2023, the District of Columbia conducted a tax sale of the Property.

62.     Plaintiffs were unaware that SLS and Shellpoint had not paid the taxes on the Property for more than two years and received no notice of the tax sale.

63.     Shellpoint, however, should have been aware that the property taxes on the Property were delinquent based on it and SLS's nonpayment.

64.     Logan Tax Services, LLC ("Logan") purchased the Property at the sale.

65.     On or about May 8, 2024, Logan filed a complaint to foreclosure Plaintiffs' right of redemption.

66.     The complaint also named the trustees responsible for Plaintiffs' mortgage note.

67.     Servbank assumed servicing of the Mortgage effective July 2024.

68.     Plaintiffs became aware of the tax sale and the foreclosure lawsuit for the first time on or about September 18, 2024, upon receipt of service of the foreclosure complaint.

69.     A hearing was scheduled in the foreclosure case for October 2, 2024, creating significant time pressure for Plaintiffs to address the issue.

70.     At least one of the trustees for the Mortgage had received service of the foreclosure complaint on or about September 16, 2024, but does not appear to have notified either Plaintiffs or Servbank.

71.     On or about September 19, 2024, Plaintiffs contacted Servbank regarding the unpaid taxes and pending tax sale.

72.     Servbank repeatedly stated that the problem was caused by the Shellpoint and that it had no relevant records.

73.     Servbank did not indicate that it would or could take any steps to resolve the situation.

74.     Plaintiffs' calls with Shellpoint were similarly unproductive, as Shellpoint simply shifted the blame to its predecessor-in-interest, SLS, and told them that it had no further role with the Mortgage following servicing transfer to Servbank.

75.     Plaintiffs requested that Shellpoint provide them with proof of payment of taxes so that they could send it to the District of Columbia.

76.     Shellpoint provided Plaintiffs only with escrow disclosure statements, which showed only supposed disbursement, not payment, though it had access to Core Logic invoices, among other documents.

77.     Shellpoint inaccurately told Plaintiffs that it had no access to servicing documents from SLS.

78.     As Defendants had indicated to Plaintiffs that they were not going to take the steps necessary to redeem the Property, and/or failed to indicate that they were going to do so, Plaintiffs reached out to Gemini Title Company ("Gemini") to arrange for direct payment.

79.     On or about September 29, 2024, Plaintiffs paid $16,287.56 to the District of Columbia to satisfy the outstanding property taxes and penalties to redeem the Property.

80.     Plaintiffs also paid $750 to Gemini for its services.

**<u>Plaintiffs' Qualified Written Requests</u>**

81.     On or about October 22, 2024, Plaintiffs sent letters to both Shellpoint and Servbank, to the addresses designated by each for receipt of QWRs and NOEs. *See* Shellpoint QWR, attached hereto as Exh A., and Servbank QWR, attached hereto as Exh. B.

82.     The letters were delivered to Shellpoint and Servbank on or about October 28, 2024.

83.     The letters included Plaintiffs' names, the property address, and the account numbers.

84.     The letter to Shellpoint identified as an error its nonpayment of property taxes for the Property and requested that Shellpoint, "[p]lease provide an accounting of what you did with the escrow funds we paid and explain why the taxes were not timely paid. Please also refund the escrow payments we made from 2021-2024 that should have been applied to tax payments but were not." *See* Exh. A.

85.     The letter to Servbank identified as an error both the nonpayment of property taxes and its duplicate payment of the redemption amount.

86.     Plaintiffs requested that Servbank "[p]lease take all steps necessary to obtain a refund of the overpayment from the DC Office of Taxes and Revenue. Please refrain from adjusting our monthly escrow payment based on this overpayment. Please also refund the escrow payments we made from 2021-2024 that should have been applied to tax payments but were not." *See* Exh. B.

87.     Both letters requested a number of documents, as well, including transaction histories and escrow documents.

88.     The letters met all requirements to be qualified written requests, notices of error, and requests for information, as those terms are defined in 12 U.S.C. § 2605(e) and 12 C.F.R. §§ 1024.35 and 36.

**Shellpoint's QWR Response**

89.    On or about November 29, 2024, Shellpoint responded to Plaintiffs' letter, signed by its "Compliance Department."

90.    Shellpoint's letter recited the errors Plaintiffs had identified but did not address them at all in its response. *See* Shellpoint QWR Response, attached hereto as Exh. C.

91.    Instead, Shellpoint's letter discussed its implementation of its merger with SLS and offered boilerplate language for why it was not providing certain documents, most of which Plaintiffs had not actually requested.

92.    Had Shellpoint properly investigated the errors cited in Plaintiffs' letter, it could have taken steps to, at minimum, reimburse Plaintiffs.

93.    The response, however, includes no evidence of any investigation whatsoever.

**Servbank's QWR Response**

94.    On or about December 11, 2024, Servbank responded to Plaintiffs' letter, in an unsigned response.

95.    The response indicated that Servbank's disbursement in or around September 2024 had included only $8,884.59 in past due taxes and that it had covered $5,113.15 in penalties.

96.    The letter further stated that Servank had sought and received a refund from the District of Columbia in the amount of $11,158.32.

97.    Servbank purports to have made Plaintiffs' escrow account "whole" but have not refunded any amounts to Plaintiffs.

98.    Moreover, the amounts refunded to Plaintiffs' escrow account are insufficient to make them whole.

99.     Specifically, Plaintiffs paid $3,590 out of their escrow account for taxes that SLS paid toward the wrong property.

100.     Plaintiffs paid an additional $16,287.56 directly to the District of Columbia.

101.     Servbank's letter confirmed that it was aware as of October 23, 2024, of Plaintiffs' direct payment, but incorrectly identified the payment as only $14,017.74.

102.     Servbank's letter notes a deduction by the District of Columbia of $2,735.75 from the refund amount to account for 2025 taxes.

103.     Given that Plaintiffs, whether through escrow or directly, had paid the District of Columbia $17,141.81, the refund Servbank applied to their escrow account was approximately $6,000.

104.     Servbank likewise failed to conduct an additional escrow analysis that would have resulted in a prompt refund to Plaintiffs of their funds, depriving them of the use of those funds for even longer.

**<u>Nonsensical Accounting on Plaintiffs' Mortgage</u>**

105.     Beginning in November 2024, Plaintiffs' mortgage statements have shown a series of nonsensical amounts and transactions.

106.     Specifically, a statement dated November 4, 2024, shows unapplied funds of $3,638.08, and a negative escrow balance of $4,868.69.

107.     That statement included a "Partial Payment Disclosure" that stated,

You currently have funds in your account that are less than your scheduled monthly payment.  We will hold these funds in a separate account until you pay the remainder of the payment.  Upon receipt of enough funds to pay your full monthly payment, we will apply your full monthly payment to your account.

108.    Plaintiffs paid their full November payment without resort to any of the unapplied funds, and the amount of the unapplied funds was more than double the amount of the monthly payment.

109.    A statement dated November 6, 2024, shows $3,615 in unapplied funds and a negative escrow balance of $4,893.69.

110.    That statement also included a "Partial Payment Disclosure."

111.    In addition, the November 6, 2024 statement indicates the reversal and reapplication of a number of payments and the associated imposition of an NSF fee, purportedly drawn from unapplied funds.

112.    Plaintiffs timely made their monthly payment, with no reversal, and no fee should have been applied.

113.    Plaintiffs' first statement from Servbank, in July 2024, had similarly indicated the unwarranted application of an NSF fee, though it, unlike the November 2024 fee, appears to have been removed.

114.    A statement dated November 7, 2024, shows the same negative escrow balance as the November 6, 2024 statement but $3,590 in unapplied funds.

115.    A statement dated December 4, 2024, similarly showed $3,590 in unapplied funds but a positive escrow balance of $6,530.55 following what was labeled as an "Initial Escrow Deposit" of $5,133.15 on November 21, 2024, and a property tax refund of $6,025.17 on November 15, 2024.

116.    A statement dated January 13, 2025, no longer shows unapplied funds but instead indicates a "Refund to Borrower" in the amount of $4,554,38, purportedly issued on January 3, 2025.

117.    Plaintiffs have received no such refund, and the amount does not match the funds due to them.

## Additional Damages

118.    As a result of the difficulties created in dealing with the tax redemption, Plaintiffs decided that maintaining the Property was too challenging and decided to sell it.

119.    Plaintiffs felt compelled to move quickly in the sale, agreeing to accept an offer that was significantly lower than they had hoped to obtain.

120.    Plaintiffs have suffered embarrassment as a result of the tax sale, a public record of which now exists indefinitely.

121.    Plaintiffs also spent numerous hours and incurred costs such as fees for Gemini, to address the tax issue.

122.    Also as a result of Defendants' actions, Plaintiffs have suffered significant stress and emotional distress, manifest through symptoms including, but not limited to loss of sleep, and crying.

## CLAIMS

### COUNT I
### VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT
### 12  U.S.C. § 2605(g) and 12 C.F.R. § 1024.34(a)
### (Against Shellpoint)

123.    Plaintiffs incorporate by reference all factual allegations in the preceding paragraphs as though fully stated herein.

124.    The terms of Plaintiffs' Mortgage required them to make payments to Shellpoint and SLS for deposit in an escrow account to pay property taxes on the Property.

125.    Shellpoint and SLS failed to make timely payments of property taxes for the correct property and in the correct amounts.

126.    Shellpoint's errors are consistent with a pattern of servicing abuses.

127.    As a result of Shellpoint's violation, Plaintiffs are entitled to recover actual and/or statutory damages pursuant to 12 U.S.C. § 2605(f)(A) and (B), as well as costs and attorney's fees, pursuant to 12 U.S.C. § 2605(f)(3).

**COUNT II**
**VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT**
**13  U.S.C. § 2605(e) and 12 C.F.R. § 1024.35**
**(Against Shellpoint)**

128.    Plaintiffs incorporate by reference all factual allegations in the preceding paragraphs as though fully stated herein.

129.    Plaintiffs sent a letter on or about October 22, 2024, to the address identified by Shellpoint for receipt of QWRs and NOEs.

130.    The letter included Plaintiffs' name, the property address, and the loan number and contained specific requests for correction of errors pursuant to 12 C.F.R. §§ 1024.35(b)(2), (4), and/or (11).

131.    Specifically, the letter referenced Shellpoint and/or its predecessor-in-interest SLS's failure to properly pay Plaintiffs' property taxes, despite Plaintiffs' regular payment of escrow amounts in their monthly payment.

132.    Shellpoint failed to conduct a reasonable investigation of the errors set out in that letter and failed to address the error at all in its letter.

133.    Shellpoint's response indicates that to the extent it performed any investigation, it was not reasonable.

134.    Shellpoint's response also fails to provide sufficient reasons for a position that no error occurred, particularly in light of the obviousness of the error at issue.

135.    Shellpoint's errors are consistent with a pattern of servicing abuses.

136.    As a result of Shellpoint's violation, Plaintiffs are entitled to recover actual and/or statutory damages pursuant to 12 U.S.C. § 2605(f)(A) and (B), as well as costs and attorney's fees, pursuant to 12 U.S.C. § 2605(f)(3).

**COUNT III**
**VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT**
**14  U.S.C. § 2605(e) and 12 C.F.R. § 1024.35**
**(Against Servbank)**

137.    Plaintiffs incorporate by reference all factual allegations in the preceding paragraphs as though fully stated herein.

138.    Plaintiffs sent a letter on or about October 22, 2024, to the address identified by Shellpoint for receipt of QWRs and NOEs.

139.    The letter included Plaintiffs' name, the property address, and the loan number and contained specific requests for correction of errors pursuant to 12 C.F.R. §§ 1024.35(b)(2), (4), and/or (11).

140.    Specifically, the letter referenced Shellpoint and/or its predecessor-in-interest SLS's failure to properly pay Plaintiffs' property taxes, as well as the duplicate redemption payments by Plaintiffs and Servbank.

141.    Servbank failed to fully correct the errors, and failed to sufficiently explain why it believed it had done so and/or why no error remained, as Servbank's response contains erroneous information.

142.    As a result of Servbank's violation, Plaintiffs are entitled to recover actual and/or statutory damages pursuant to 12 U.S.C. § 2605(f)(A) and (B), as well as costs and attorney's fees, pursuant to 12 U.S.C. § 2605(f)(3).

**COUNT IV**
**Violation of the D.C. Consumer Protection Procedures Act**
**D.C. Code § 28-3901 *et seq.***

**(Against Shellpoint)**

143.     Plaintiffs incorporate by reference all of the factual allegations in the above paragraphs of this Complaint as though fully stated herein.

144.     Mortgage servicing and mortgage lending involve the direct or indirect effectuation of consumer services and are therefore trade practices within the meaning of D.C. Code §§ 28-3901(a)(6) and (7).

145.     Shellpoint, and its predecessor-in-interest, SLS, were engaged in the ordinary course of business in a trade practice, and Shellpoint is therefore a merchant as that term is defined in D.C. Code § 28-3901(a)(3).

146.     Plaintiffs are "consumers" within the meaning of D.C. Code § 28-3901(a)(2).

147.     Shellpoint, in its own name or as its predecessor-in-interest SLS, violated D.C. Code §§ 28-3904(e), (e-1), and/or (f-1) by misrepresenting, explicitly or implicitly:

    a.  That it had made or would make full and timely payment of property taxes on Plaintiffs' property;

    b.  That it had no access to SLS's records for Plaintiffs' Mortgage and escrow disbursements;

    c.  In the escrow disclosures, the anticipated property tax amounts applicable to the Property;

    d.  In the escrow disclosures and monthly statements, the accurate balance of Plaintiffs' escrow account;

    e.  That it had no power to remediate the failure to pay Plaintiffs' property taxes;

    f.  That the escrow disclosures it provided to Plaintiffs amounted to proof of payment of the taxes on the Property; and

g.  That it had conducted a reasonable investigation of Plaintiffs' QWR.

148.  Shellpoint, in its own name or as its predecessor-in-interest SLS, violated D.C. Code § 28-3904(f) by:

a.  Failing to inform Plaintiffs that it, as Shellpoint or SLS, had not made proper and timely payment of property taxes on their Property;

b.  Failing to inform Plaintiffs that the property taxes on their property were delinquent;

c.  Failing to provide Plaintiffs with a history of escrow payments in the July 2024 escrow disclosure;

d.   Failing to provide Plaintiffs with an accurate escrow balance;

e.  Failing to inform Plaintiffs that taxes were being paid from their escrow account to an incorrect property;

f.  Failing to provide Plaintiffs with information documenting proof of the property tax payments made from their escrow account;

g.  Failing to provide Plaintiffs with information as to why their taxes had not been paid when Plaintiffs called in or around September 2024; and

h.  Failing to provide Plaintiffs with the Core Logic invoices prior to the QWR response.

149.  Shellpoint and SLS's implicit and explicit misrepresentations and omissions were material, and had the tendency to mislead.

150.  Plaintiffs relied on Shellpoint and SLS's misrepresentations and omissions in determining what steps to take with respect to the Mortgage and tax payments.

151.  As a result of Shellpoint and its predecessor-in-interest's actions, Plaintiffs suffered damages as set forth above.

152.  Plaintiffs are, accordingly, entitled to recover treble damages, punitive damages,

costs, and attorney's fees, pursuant to D.C. Code § 28-3905(k).

**COUNT V**
**Violation of the D.C. Consumer Protection Procedures Act**
**D.C. Code § 28-3901 *et seq.***
**(Against Servbank)**

153.    Plaintiffs incorporate by reference all of the factual allegations in the above paragraphs of this Complaint as though fully stated herein.

154.    Mortgage servicing and mortgage lending involve the direct or indirect effectuation of consumer services and are therefore trade practices within the meaning of D.C. Code §§ 28-3901(a)(6) and (7).

155.    Servbank is engaged in the ordinary course of business in a trade practice, and Shellpoint is therefore a merchant as that term is defined in D.C. Code § 28-3901(a)(3).

156.    Plaintiffs are "consumers" within the meaning of D.C. Code § 28-3901(a)(2).

157.    Servbank, violated D.C. Code §§ 28-3904(e), (e-1), and/or (f-1) by misrepresenting, explicitly or implicitly:

a.    That Plaintiffs' sole recourse for resolving the tax issues was to reach out to Shellpoint;

b.    That it has made Plaintiffs' escrow account whole;

c.    That Plaintiff paid only $14,017.74 to the District of Columbia to satisfy the past due property taxes;

d.    That Plaintiffs should have any unapplied funds on their mortgage account;

e.    That the amount of unapplied funds listed on mortgage statements was accurate;

f.    That Plaintiffs had made any partial payments on their Mortgage;

g.    That unapplied funds were insufficient to cover a full mortgage payment;

h.    That Plaintiffs had attempted to make any mortgage payments that were reversed or

rejected based on insufficient funds;

i. That it could properly apply an NSF fee to Plaintiffs' account;

j. That it had issued a refund to Plaintiffs; and

k. That the amount of the purported refund was the correct amount owed to Plaintiffs.

158.     Servbank violated D.C. Code § 28-3904(f) by:

a. Failing to inform Plaintiffs that it would be paying the past due property taxes; and

b. Failing to provide Plaintiffs with an updated escrow analysis following receipt of the refund.

159.     Servbank's implicit and explicit misrepresentations and omissions were material, and had the tendency to mislead.

160.     Plaintiffs relied on Servbank's misrepresentations and omissions in determining what steps to take with respect to the Mortgage and tax payments.

161.     As a result of Servbank's actions, Plaintiffs suffered damages as set forth above.

162.     Plaintiffs are, accordingly, entitled to recover treble damages, punitive damages, costs, and attorney's fees, pursuant to D.C. Code § 28-3905(k).

**COUNT VI**
**Breach of Fiduciary Duty**
**(Against Shellpoint)**

163.     Plaintiffs incorporate by reference all of the factual allegations in the above paragraphs of this Complaint as though fully stated herein.

164.     Shellpoint and its predecessor-in-interest, SLS, served as escrow agents for Plaintiffs with respect to the Mortgage and were, accordingly, fiduciaries with respect to Plaintiffs' escrow account.

165.     Shellpoint and SLS's duties of care were defined by the Deed of Trust associated

with the Mortgage, recorded at Doc. No. 2021086960, and by 12 C.F.R. §§ 1024.17 and 34.

166.    Shellpoint and SLS were obligated to collect Plaintiffs' property tax payments and to convey them to the District of Columbia, and to do so with scrupulous honesty, skill, and diligence.

167.    Plaintiffs timely made all payments to their escrow account, and Shellpoint and SLS breached their duty of care by failing to convey property tax payments on the correct property and in the correct amount to the District of Columbia.

168.    As a result of Shellpoint and it's predecessor-in-interest SLS's breaches, Plaintiffs suffered damages as set forth above, for which Shellpoint is liable to Plaintiffs.

**COUNT VII**
**Negligence**
**(Against Shellpoint)**

169.    Plaintiffs incorporate by reference the factual allegations in the foregoing paragraphs of this Complaint as though fully stated herein.

170.    Shellpoint and its predecessor-in-interest SLS had a duty of care, as established by RESPA and Regulation X, to promptly convey from Plaintiffs' escrow account all property tax payments on the Property;

171.    Shellpoint and SLS breached that duty by failing to convey such payments on the correct property and in the correct amount.

172.    Shellpoint and SLS's actions caused a delinquency that resulted in a tax sale and caused Plaintiffs to suffer damages as set forth above.

173.    As a result of the Shellpoint and its predecessor-in-interest's wrongful acts, Plaintiffs are entitled to compensatory damages.

## **PRAYER FOR RELIEF**

WHEREFORE, to redress the injuries caused by Defendants' conduct as stated in the foregoing paragraphs, Plaintiff hereby requests the following relief:

- an award of actual and/or compensatory;

- award of statutory damages;

- award of treble damages;

- for an award of costs of litigation and reasonable attorney's fees;

- an award of punitive damages;

- an award of pre-judgment and post-judgment interest; and

- for such other and further relief as may be just and proper.

## **JURY DEMAND**

Plaintiffs hereby request a trial by jury on all claims so triable.


Dated:  Washington, D.C.                              Respectfully submitted on behalf of Plaintiff,
         January 21, 2025


                                       */s/ Courtney L. Weiner*
                                       Courtney L. Weiner (#992797)
                                       Law Office of Courtney Weiner PLLC
                                       1629 K Street NW, Suite 300
                                       Washington, DC 20006
                                       PH: 202-827-9980
                                       cw@courtneyweinerlaw.com


                                       *Attorney for Plaintiffs*